Capitol High Tech Technology Good morning, Your Honors, and thank you for the invitation to appear today. I appreciate it. I'll try to reserve some time. The issues are fairly narrow. The issues are whether the District Court and whether General Electric may set aside the Uniform Commercial Code and the evidentiary record made in this case, despite failing to prove any evidence of their entitlement to damage, and then convert their own failures in that regard to then punish the lessees with a punitive damage clause that would be disallowed, I believe, universally in the country under 2A504. If I could, let me take you by way of background to this case proceeding originally by General Electric filing a lawsuit in Federal District Court in Arizona, conceding the fact that Arizona was the site for all the equipment, where all the equipment had been purchased, specced, and we've heard some discussion about that today, into Phoenix, Arizona. The businesses were substantial, employed about 230 people, generated approximately $180 million a year, I'm sorry, $180 million over seven years under Mr. Goodman's watch. The issue came down to whether under the Uniform Commercial Code, which had to be beaten out of the defense at trial for them to concede that their own contracts required compliance under the Uniform Commercial Code over plaintiff's counsel's objection in that regard, and that's in the record. So this has been a dogfight under the Uniform Commercial Code. The plaintiffs contending that there was no application at all, despite the clear and expressed wording in the contract that it was governed under the UCC, and the defense contending there were no provable damages under the UCC, nor do you get to punitive damages or a liquidated damages clause under the UCC if you can't prove that you acted in a commercially reasonable fashion. The thrust of the defense case on cross-examination were these following factors. When asked whether the equipment at issue had been effectively marketed, the answers were, I don't know, collectively by their two experts. They had apparently engaged in a third-party contract with an auctioneer in Ontario, California to remove all of the equipment at issue under the guarantee contracts and under the specific contracts, as opposed to selling the items that were handed back to them in Phoenix, Arizona, where you would have at the point in time in 2003 and 2004 one of the most robust economies and markets for construction equipment in the country. Mr. Goodwin. Yes. Assuming that a better deal could have been had in Phoenix doesn't necessarily mean that it was not reasonable to go to Ontario. And your Honor is exactly correct. And the case law that I have cited to you from New York, from California, lists a multitude of areas that you need to examine to ascertain whether a given creditor acted in a commercially reasonable fashion. Those would include, how did they market the equipment if at all? Was there only one bid? Was it a sweetheart deal? Was it disclosed? Were appraisals performed? How did you ascertain what the fair market value was other than the price received? In this case, the only evidence adduced by the creditor was that the price received at a sale, at an auction, to one bid, if that, was the evidence of price received. They skipped everything else. And under cross, yes, your Honor. Counsel, there is evidence that it was widely advertised. Is that correct? No. That is, that was based upon the witnesses that GE provided a trial saying they thought that the third-party contractor had advertised it. They thought they had sent out emails. They thought that they had put an ad in a paper. And I believe the paper ad was proven. But under the standards articulated in California, in Ford and Vallejos, the ITT communications, well, Ingersoll Rand v. Miller Mining, virtually every case specifically requires that you go to the locale in which the equipment is located to ascertain the breadth and you contact the brokers, the dealers, you contact everybody in that specific locale to ascertain are there interested buyers so you don't need to remove the equipment out of its jurisdiction. And I think what we've done is we've conflated the issues of is it a market, which would be used typically in an exchange situation where you have tradable stock, this, that. Ontario, California is not a recognized market and never has been. Is this auction house a recognized auction house for dealing with this kind of equipment? I don't have any idea. I was first informed about the auctioneer relationship and the third-party contract supposedly disposing of the creditor's obligations under the Uniform Commercial Code during trial. I asked for the contract repetitively. I was not given access to it, nor did the court require it be produced. My position is simply this. You cannot contract away to a third party the requirements of commercial reasonableness, due diligence, and good faith, which are inviolate as far as the guarantors are concerned. And that's exactly what happened in this case. Well, you certainly could contract with a recognized auction house that had a good record of marketing things to a national market. But you're saying that's not in the evidence? No, of course not, Your Honor. And more to the point, it's you don't just hand it over to an auction house. And in this case, what they did was even more aggravated. They shipped the equipment several hundred miles away to an area which is not specified for the type of equipment that was spec based on Arizona law and transportation law, and they set no reserve pricing. They admitted under oath that whatever was offered, whether by one person or any people, that they couldn't testify to, whether it was $1, $50, whatever the amount was, was acceptable to them. That simply is not allowed for in any case law in the entire country. And that is not evidence of good faith. To prove the fact, I asked them repetitively, both their experts under oath, and this has been provided in the record very specifically, how did you arrive at a fair market value? Well, we had access to a database of 10,000 items, and we had access to the Black Book, and we had access to all the traditional publications that would allow us to ascertain what a fair market value is. Can I see that evidence? No. Not one phone call was logged, not one document was provided that showed what the appraised value, the fair market value of this equipment was on the date or in and around the disposition dates in Ontario, California. Frankly, the guarantors had no idea what this company, GE, was up to, and admittedly, General Electric and or Citi Capital are two of the most sophisticated companies on the planet. They also have access to every major broker, major dealer, major user of this equipment that could be found anywhere. And did they exercise in any of those options, use their own database? No. They skipped it all. Why would they skip providing the guarantors a legitimate basis to ascertain what the fair market value was? The only answer that I can come up with is because so that they could accept whatever was offered and claim after the fact that that was the fair market value on a given day without any reserve pricing, no ability to credit bid, they simply didn't care what the amount was that they got, and that is prohibited. Was the fair market value part of the calculus on the GE lease? No, they never, there was no appraisals, no evidence of Well, no, but was it a, it was a part of the calculus on the Citi lease, as I recall it. No, that's, it was provided by the defense through their expert. No, but in terms of the terms of the, of the, of the, the Citi Capital lease did have the present value of, as part of the calculus, but did, I didn't think the GE leases did. That's a very good point, Your Honor, and they all require under statute 2A.528 and 527 that you reduce to net present value the future lease stream, unpaid lease stream, which was not done in any case. They went from skipping the foundations of good faith, of finding a fair market value, of proper marketing disposition, manner and method of sale, there was no even reason to basis for why they would pitch an auction house versus a private sale. None of that was done, and then we skip over here and then we then penalize the lessees on a punitive damage formula that is under their loss table or casualty table which in everybody's mind and is admitted to by the general electric representatives represented the fair market value. So what they did was they skipped all the information that you're asking me about in terms of reducing the net present value, the future income stream, all the other damage information that was to be provided because they had no predicate for a fair market value. And they simply jumped over to this damage table that they admitted was a fair market value estimate and then charged me twice. And the judge in setting aside 2A504, which hasn't been allowed, GE set the standards, by the way, on liquidated damage provisions. And if I can cite you to that case, in Ray Montgomery Ward Holding, although it doesn't reference General Electric, General Electric was actually the owner in Montgomery Ward Holdings. They set the seminal case in the United States, I believe it was out of Delaware, 3rd Circuit, 2003, for why the exact phrases and terms used in this case, almost the identical lease, does not allow for punitive damages. And the judge wouldn't let me introduce that information either as an admission against interest. I even had the briefs by General Electric. And why is that important? Because this is the uniform commercial code, the purpose of which in every state is the uniform, the laws and the statutes so that creditors and guarantors and lessees understand how to operate, whether it's a secure transaction or otherwise. And that was all set aside in this case. 2A507, which required General Electric to at a minimum provide the fair market rental rate and the equipment existed, gone. There wasn't one question that I asked that is contained within much of the briefing that General Electric could answer affirmatively to that it had conducted any investigation whatsoever, that it used any resources available to it, that it cared what the numbers were. And frankly, that's why you didn't see any law in their case. And that's why you see very little, if any, law in the court's so-called findings of fact, conclusions of law. There was nothing in the evidentiary record for a court to legitimately conclude that these sales were based in good faith, were conducted in a commercially reasonable manner by every conceivable measure within the continental U.S. And the case law cited from California, from New York, Delaware, Illinois. General Electric, in fact, is the seminal authority for case law, which I've cited in here, on why you don't get the punitive damages when you can't prove your underlying damage case. And with that, I'd like to entertain any questions and reserve the last five and a half minutes for a rebuttal. Ms. Freeman. May it please the Court, my name is Susan Freeman, and I represent City Capital and GE in this matter. I'm afraid that Mr. Goodman has grossly misstated the record that is before the Court. We had a three-day bench trial, and in that three-day bench trial, there was substantial evidence that addressed the various points that Mr. Goodman has raised here, among other things, there was evidence that supported the finding of fact number 13 that the Ontario-California site is a recognized market for the sale of construction equipment. Mr. Doyle testified at length. Mr. Doyle has, at that point, 12 to 13 years of experience in the selling, the recovery and selling of used equipment. He testified as to exactly what he did with this equipment, including inspecting it, getting outside inspections as well. This was old, used equipment. Some of the trucks had 700,000 miles on them, and that is supported by the record at ER 105 to 107 and supplemental excerpt of record 130 to 132. He testified as to all of the things he did to try and maximize the sale proceeds here. He was the one that was in charge of the advertising and the selling. He did, in fact, use the additional services of the Ontario-California facility. It is a recognized location, as Mr. Doyle testified. He said, people who know, people know to come to this sales event in a place that does, that organizes these events to have sales of this kind of construction equipment. There was substantial advertising, and the record reflects it. There were, two weeks before, there was this truck paper ad with a circulation of over 700,000 people who are people who are in the market for used construction equipment. He sent 5 to 10,000 brochures out, had internet access with a website that, where you could specifically look to the particular piece of equipment, blow it up so that you can see what the treads on the tire look like and how scratched up it is. There was a 35,000 to 50,000 people who received these additional emails that were advising them, and these are the people who are on the, effectively, the list that were compiled to try and determine people who are in the market for this kind of equipment. In addition, Mr. Doyle testified that he personally contacted between 60, I'm sorry, that he personally contacted between 50 and 100 additional prospective buyers that he knew from his 14 years of experience were prospective buyers for this type of equipment. In fact, there were three public auctions. There were 60 to 100 qualified prospective bidders. These are prospective bidders who came out and who actually showed that they had the wherewithal to make the payments, not just tire kickers, who came out to these auctions. Mr. Doyle testified that he had set a private reserve. He figured out what the real values were and when the values were not achieved. At that, at those public auctions, he withdrew some of the equipment and sold it at private sales, you know, followed up to make sure that he was actually getting the value. So we do have a commercially reasonable sale here. The findings of fact of the trial court are not clearly erroneous. They were supported by the record here. Mr. Goodman says, well, you know, you should have sold it in Phoenix and made calls to, he listed four or five companies in Phoenix that he thought were in the market for this kind of equipment. And frankly, if there had, first, Mr. Doyle testified that he believed that those people probably were on the list of ones who had gotten these notices. He testified that he expected they were at ER 76. And further, if there had only been, you know, those four or five contacts and those people hadn't bought all of this construction equipment, how is that commercially reasonable? I mean, the commercial reasonableness under the UCC depends on what is done to try and maximize the number of people who are to come. It does not, pursuant to 9507, the fact that you could have gotten a better price if you had done something in a different manner does not make it not commercially reasonable. What makes it commercially reasonable is whether you are engaging in efforts to try and bring in reasonable notice to the public, trying to sell at the, in conformity with reasonable commercial practices among dealers in this kind of a property. The GE lease specifically even provided that this could be a wholesale, that this was to be a wholesale sale, not to, you know, specific retail end users. You didn't have to go out and figure out who all of the potential retail end users are and get it to them. In this instance, notices were going out to wholesale and retail. So we do have that. The court asked about the remedy provision and, in fact, at SER 52, there is a provision in the GE lease that provides for payment of the present value of the aggregate of rentals to be paid for such vehicle by such third party. We do have that as part of the determination of the lease damages provisions. Effectively, although it was somewhat different between the GE leases and the city capital leases, each of them had the accrued unpaid rent and the present value of this future rental stream that was to be obtained over a course of time, over the course of the lease, and that was discounted back to present value. And then you collected the anticipated residual value at the end of that lease term. There's an assumption in these leases that the lessee is going to pay the minimal amount to go ahead and buy off the leases. So you have the anticipated residual value and, you know, if that was not to happen, then the lessor would get that residual value back. So you have that anticipated residual value. You have the present value of the future monthly rents and you have the attorney's fees for the collection. And reduced against that are the sales proceeds that are obtained through these commercially reasonable sales. In the GE leases, you had this final adjusted value, but that's, in effect, a calculation, again, of the projected value at the end of the lease term and then recovering that contracted value that you're not getting through the lease. There is a formula that the UCC expressly recognizes in 2A.504 as being one of the methods of having appropriate liquidated damages. The UCC in 2A.504 expressly says that the parties can contract to have a liquidated damages provision so long as it's in a formula or amount that's reasonable in light of the anticipated harm that would be caused by the against the actual harm that was incurred. It's what you're reasonably projecting at the time that you're entering into this contract. And here, that's exactly what they did. The comments to that expressly recognizes that one method is to have one common method that is approved here is to have the sum of lease payments past due, accelerated future lease acquisition, plus cost, interest, attorney's fees. And another is to utilize a periodic depreciation allocation as a credit to the enforced amount. And that's what these two provisions did. So what we have are liquidated damages provisions that are appropriate and reasonable and exercised, recognized under the Uniform Commercial Code. Mr. Goodman has cited the Montgomery Ward case, which he says is the seminal case. And, in fact, if the Court looks at the Montgomery Ward case, you'll see that in the Montgomery Ward case, the particular lease provided more than those two things. It provided for, in addition to the, in addition to the present value of unreasonable damages, it provided unpaid rent through the end of the lease term, and the present value of the residual value of the equipment necessary, also an amount allowing Meridian to realize a profit on the transaction. And the Court said, that's the problem, this little additional amount that you're getting over and above the amounts that are authorized in the UCC. You don't get this additional profit to be recognized. And the Court does quote the provisions of the comment of the UCC about how liquidated damages formula that's this particular sum, which is, in fact, the recognized amount that's reflected in our leases and was obtained here, said that's what you should be doing. And, instead, you're seeking this profit over and above that amount. The other case that Mr. Goodman has cited here to the Court, the Ford v. Vallejos case, is one where the only notice of sale that was given of a uniform commercial code purported sale was in the, a single notice of the sale, time and place, in the Arizona Republic Newspaper of General Circulation in Phoenix, that indeed even inadvertently omitted the information about who to contact. And that was the only notice. And the Court said, you know, that's not sufficient. Instead, you need to have publicity that would be, that a responsible dealer would utilize. And if you have that kind of publicity, if you have, for example, placing reasonably prominent announcements in recognized trade journals, which was done, contacting individuals or entities known to be seeking in this place an airplane of this type, that was done through these e-mail notices and the trade publications and the actual indeed telephonic contact by Mr. Doyle. And the Court's recognizing here that this is, as the UCC says in 9507, property sold by methods a responsible dealer would utilize is sold in a commercially reasonable manner. You just look to how you go about selling. You don't go about looking to see, well, what was the actual price and did you have an appraisal first? Here you had people who evaluated this equipment, figured out what it was probably worth, indeed conducted a reasonable and appropriate uniform commercial code sale, and when thought that, no, this wasn't quite as much as would be appropriate to realize, pulled it back using the reserve and went ahead and sold it by a private sale as well. Let me just mention another thing that I anticipate Mr. Goodman may bring up on rebuttal, and that's that in the bankruptcy case of his company, GTI, my clients did have an administrative expense claim because there was a six-denyment period for the different lessors before they could get their property back, before there was a lift stay, and they were allowed to repossess the equipment and go forward with the sale, and so they had administrative expense claims for that period of time. Within the last 30 days, those administrative expense claims have finally been paid, and so there has been, and I can avow to the court and if the court wants, I can provide by way of a supplemental filing, there have been notices of satisfaction of judgment and partial satisfaction of judgment with respect to the there were effectively two judgments for each. There was a base judgment for the amount that was due under the terms of these leases, and then there was an additional judgment for attorney's fees and costs that was determined after the fact. In the city capital case, the amount was used to, did in fact satisfy the attorney's fees judgment, and the notices of satisfaction showed it partially satisfied the underlying judgment, and in the GE case, it partially satisfied the attorney's fees judgment. The amount of the administrative expense claims were prorated to the amount, or the amount received for these was taken prorated to the amount for each of the various leases and those administrative expense claims themselves. So it was allocated. There's no intent by GE or city capital to try and get more than they were entitled to. In each case, the amount that they received at the UCC sales did in fact reduce the amounts that they were entitled to as liquidated damages under the terms of the contracts, and that was all taken into account. Findings of fact say that. Findings of fact that are not clearly erroneous. And then we now have this additional amount that have been received under the bankruptcy, and so those also reduce the judgment. So the amounts that would be obtained under the guarantees would just be to the amount of the judgments. You know, we're not going out and trying to make a profit on this over and above the amount of the losses. Let's see. I think that I have addressed everything. Does the Court have any questions? I don't think so. Thank you. Okay. Just the ‑‑ I guess one last thing is that under the Arizona Supreme Court held in the Gulf Homes case that whether a seller's action in disposing of repossessed property is commercially reasonable is treated as a finding of fact, and so it's governed by the clearly erroneous standard. And here we certainly have findings of fact that spell that out, explain that this was in fact a commercially reasonable sale, and that the liquidated damages were accurately calculated, taking into account everything under the leases. Okay. Thank you very much. Thank you. Thank you, Mr. Freeman. Mr. Goodwin. Thank you, Your Honor. In the few minutes I have left, what ABLE counsel actually testified to, had that been the record, would have been absolutely legally correct and factually correct. It's not. Starting with the citation to Gulf Homes as one of the leading Arizona Supreme Court cases, even though it's from the approximately 1984, it was essentially summing up the same situation that occurred here. It was contending that there was a factual issue in terms of commercially unreasonable behavior where the creditor shipped a mobile home from either Tucson to Phoenix or vice versa, and then advertised in other markets completely apart and separate from where the equipment was originally located, which is exactly the case here. Why that case was cited by the Court was never explained. But it actually supports the defense case, and it is on point. And you don't get to a clearly, you don't get to any discretion in terms of a question of fact unless you have an evidentiary record to support that conclusion. And in this case, in the next few minutes, I'll explain why there is no evidence and why there is no record cited by General Electric or the Court in the so-called findings of fact, and there is no law to support whatever the Court did in this case. And that is why, although she can take aim at some of the cases and try to focus on it was a notice provision, the upshot of all the cases that I've cited in the panel are that they deal with commercially reasonable behavior, what is required to adequately market, and we even heard earlier when there was an exchange dealing with the Internet. We're out in cyberspace. The fact that the lawyer is now acting as a testifying witness doesn't mean that that was the record that was created in this case, and that is why I attached the full cross-exam and the direct exams of myself, of my expert, Mr. Carmichael, which was undisputed, uncontroverted, the cross-exam lasted approximately five minutes, and there was just nowhere for them to go because of the manner and method and detail with which he approached the damages. There were no reductions to net present value in this case by the plaintiff. The settlement I will talk about last and how it impacts this case to the extent that it does, counsel said one thing that I'll quote, they finally figured out what it was worth. That is their substitute for what they contend is a commercially reasonable fair market value. Counsel didn't tell you, which is true, there were no appraisals, there was no way to ascertain what they believe the value of the equipment was before they sold it. The contract that was entered into with the auction house was entered into before the contracts in this case. It wasn't as if, as your Honor suggested earlier, that they went out and they found an adequate auction house to go ahead and dispose of the equipment without reserve values or credit values. This was a binding contract which subjected General Electric and City Capital to punitive damages if they didn't use the auction house in a The issue is can they farm out their duties to conduct an appraisal or do all the things they should have done in terms of contacting prospective buyers, real estate brokers, which was not done here. No, they can't. I don't know of any case law, and they've cited none, that allows them to do exactly what happened here. Counsel said that there were residual values here which allowed them to escalate the value. There weren't. As a matter of contract, there were no residual values. Their expert testified the same way. Anticipated harm, the allowance of punitive damages. You only get to punitive or penal or liquidated damages where the harm is incapable of estimation at the inception of the contract or difficult or impossible. In this case, page after page of testimony was elicited from the plaintiff's experts. Did you compute your damages to a mathematical certainty to the penny at the inception of the case? The answer is yes. These are the most sophisticated financial houses on the planet. They knew exactly what their rate of return was, their internal rate of return, their interest, their depreciation. There was nothing that was unanticipated subject to a punitive damage clause at the inception of this case, in the inception of these leases. They claim that they're not going after anything that they're not entitled to. Well, the fact of the matter is the damage calculations exceed by approximately 100% what they would have received had the contract been fully performed under the lease. And that's the crux of the issue here. They didn't prove their entitlement to damages under 528 or 527. And they of course could not do so under 504 by skipping the fundamentals of a commercially reasonable sale and then use a casualty clause, which is expressly detailed in the Montgomery Ward case as something that you apply in the terms of a loss. I'm out of time. Any questions Your Honor? I don't think so. Thank you. Thank you.
judges: Fletcher, Rymer, Duffy